John H. Carey v. Commissioner.
Carey v. Comm'r
Docket No. 15980.
United States Tax Court
1950 Tax Ct. Memo LEXIS 248; 9 T.C.M. (CCH) 197; T.C.M. (RIA) 50065; March 15, 1950
*248 John C. Parsons, Esq., for the petitioner. Stanley Herzfeld, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner challenges respondent's determination of a deficiency of $25,018.77 in income and victory tax for 1943, and a deficiency of $11,481.07 in income tax for 1944. Computation of the deficiency for 1943 involves also the income for 1942, under the Current Tax Payment Act of 1943. Respondent has abandoned a proposed increase of the deficiency raised in an amended answer. The only remaining issue is whether respondent was correct in refusing to recognize petitioner's wife as a partner in an enterprise and taxing to petitioner that portion of the business income credited to her. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found. Petitioner is a resident of Greenwich, Connecticut, and filed his returns for the periods involved with the collector of internal revenue for the district of Connecticut. Petitioner is a chemist, a graduate of Boston College, and has completed special courses in textile chemistry and dyeing at Lowell Textile Institute, in organic chemistry *249 at the Drexel Institute, and in cotton manufacturing at Philadelphia Textile School. Petitioner served for two years as chief chemist at the Proximity Manufacturing Company, and for six years at the Brogon Mills, two years as chief chemist and four years as assistant to the President in Charge of Manufacturing. During World War I petitioner was a lieutenant in the Chemical Warfare Service, where he did research work for nineteen months on poison gases. Petitioner is a member of the American Society of Textile Chemists and Colorists, having served on several committees for the development of textile fabrics for the armed forces, and he has long been active in connection with the experimentation and development of various chemical products. Since January 1, 1925, petitioner has been associated with Wellington Sears Company, Inc., hereinafter called Wellington, which represents cotton mills throughout the country. Petitioner has been employed as a "technical executive" concerned with problems arising in connection with the dyeing and finishing of textile fabrics. In 1942 petitioner's position, at an annual salary of $5,760, was handling relationships between the mills and the finishing *250 plants on technical matters when customers had difficulties. For approximately eight years prior to 1927 petitioner's wife, Arline K. Carey, hereinafter called Arline, was employed as a cashier in the Highway Department of the State of Connecticut. On October 10, 1927, petitioner and Arline were married. Between that time and May 2, 1942, Arline did not engage in any business or occupation. In 1942 petitioner and Arline had three children who were approximately 7, 8, and 14 years old. On June 14, 1928, savings account No. X1322 was opened in the name of Arline in the First National Bank of Mount Vernon, New York. Between that date and December 4, 1930, deposits totaling $1,387.07 were made in that account and withdrawals were made totaling $520. At an undisclosed date prior to December 4, 1930, the account was converted to a joint account payable to the order of either Arline or petitioner, or the survivor. Subsequently petitioner made at least one withdrawal. Between December 4, 1930, and August 1, 1932, deposits were made totaling $712, and withdrawals were made totaling $825. The source of all deposits in that account was petitioner's salary. Most of the withdrawals were made *251 by Arline in order to pay for household expenses. On August 1, 1932, the balance in that account of $845.64 was transferred to joint savings account No. X1164 which was opened on that day in the same bank in the name of Arline and petitioner. The signature card for account No. X1164 bears only Arline's signature. Petitioner had the right to sign his name on that card in the bank's file and then he could have made withdrawals. Between August 1, 1932, and April 27, 1942, deposits were made in that account from petitioner's salary, totaling $4,152.54, and withdrawals for household expenses were made by Arline, totaling $3,066. In February 1942 petitioner was approached by William D. Timmons, hereinafter called Timmons, who had organized the Fox Chemical Company, hereinafter called Fox, which was manufacturing a chemical compound for use by finishing plants in fireproofing fabrics. Fox was the supplier of The Buckeye Fabric Finishing Company, hereinafter called Buckeye. Fox had the equipment and capacity to manufacture more material than Buckeye needed. Timmons asked petitioner, who had experience in the business and contacts with various finishing companies, if petitioner was interested *252 in assisting him in distributing the compound and finding customers for Fox's surplus. Petitioner realized that as long as the war lasted both the Army and Navy might need a large quantity of a fire, water, and weather resistant compound which could be applied to cotton fabrics. Petitioner informed Timmons that he was interested in working out some arrangement to market the compound produced by Fox. Petitioner indicated that he would need technical assistance since application of the compound presented technical problems. Timmons suggested to petitioner that technical assistance might be supplied by Timmons' brother, John F. Timmons, hereinafter called John, who was an electrical engineer, a graduate of Ohio State University, formerly connected with several large companies, and at that time serving as treasurer of Buckeye. In early March, 1942, petitioner had several discussions with Timmons and John. Petitioner and John informally agreed to investigate the possibility of obtaining customers and to consider the formation of an organization to distribute and sell the compound. In March and April 1942 petitioner contacted possible purchasers of the compound, including the Fairforest *253 Finishing Company, hereinafter called Fairforest, the Gregg Dyeing Company, and the Bigelow-Sanford Company. The first prospective customer approached by petitioner was Fairforest which was engaged in the custom finishing of cotton duck material. Petitioner was friendly with J. J. Newton, general manager of Fairforest, and was familiar with the size and operations of the firm. Petitioner inquired of Newton whether the company would be interested in fireproofing their material with the compound which he could make available. Petitioner and Newton understood that Fairforest would be able to obtain, on a competitive basis, substantial quantities of the compound from Fox through orders from petitioner. Newton purchased a drum of the compound and set up equipment to apply it to some sample yardage which was subsequently tested by an Army Quartermaster Depot about March 15th. The sample was satisfactory and Fairforest received a contract for the material. In April, 1942, Newton asked petitioner whether the compound could be supplied, and after having consulted with Timmons, petitioner informed Newton that the compound was available. Newton placed an order with petitioner. At this time petitioner *254 expected Newton to order, on a competitive basis such amounts of the compound as Fairforest might need in the future. Petitioner and Arline consulted an attorney concerning the execution of a partnership agreement by petitioner, Arline, and John. The attorney advised petitioner and Arline that some arbitrary limited amount of capital such as $250 from each partner, would suffice to begin the business. On April 27, 1942, the sum of $500 was withdrawn for that purpose from savings account No. X1164 in the First National Bank of Mt. Vernon, New York. Petitioner was aware that the total tax payable on income from the business would be decreased if the income were divided between him and his wife. On May 2, 1942, petitioner, Arline, and John executed an agreement which provided that they agreed to be partners under the name of The Middlesex Products Co. in the business of buying and selling fire and waterproofing chemical compounds; that each partner had contributed the sum of $250; that the partners would exert themselves to the utmost of their skill and power for their joint interest; that profits were to be shared and losses borne equally by all partners; and that the usual books *255 of account should be kept to which each partner should have access. On the same day petitioner, Arline, and John signed an agreement providing that the funds of The Middlesex Products Co., hereinafter called Middlesex, be deposited in the Bergen Trust Company of New Jersey and that they be subject to withdrawal by check signed by any one of the three. Middlesex also had an account in the Irving Trust Company in Jersey City. The books of account of Middlesex show a credit of $250 to each of the capital accounts of petitioner, Arline, and John as of May 8, 1942. A certificate of business name, signed by petitioner, Arline, and John, and stating they were partners in Middlesex, was filed with the Clerk of the County of Hudson. On May 2, 1942, Middlesex opened an office in Jersey City, New Jersey, where it engaged desk room with telephone service at an expense of $50 per month. A fee of $25 was paid to the attorney. Other minor expenditures were made for various items, including a desk, typewriter, cabinet, and stationery. Expenses were nominal and initial outlays totaled approximately $180. In May and June 1942 Arline took care of the office approximately three days a week. In July *256 1942 the company engaged a secretary, Emily K. Calnon, to supervise the office on a full-time basis, which entailed the issuing of invoices and other papers, sending orders, and handling correspondence. Thenceforth Arline took no active part in the office. A letter was sent to the Bergen Trust Company of New Jersey, signed by petitioner, John, and Arline on October 17, 1942, stating that any one of them or the secretary, Emily K. Calnon, was authorized to sign checks. Throughout the period here involved, petitioner held a position with Wellington. John held a position with Buckeye. Petitioner was in charge of purchases and sales of material for Middlesex. John took charge of the engineering responsibilities connected with the application of the compound, although upon at least one occasion from March 12 to March 16, 1943, petitioner made a business trip to Fariforest in connection with difficulties then had by that company with the compound. The following is a schedule showing amounts spent by the parties for travel and entertainment in the course of the business as shown on the books of the company: John H.
Arline K.
John
Year Ended
Total
Carey
Carey
Timmons
Nov. 30, 1942
$1,004.49
$1,004.49
None
None
Nov. 30, 1943
3,037.13
2,615.96
None
$ 421.17
Nov. 30, 1944
5,241.32
3,814.45
None
1,426.87
*257 The two principal customers of Middlesex, both obtained by petitioner, were Fairforest and the American Pad and Textile Company. The sole source of the products sold by Middlesex to these two customers was Fox. Middlesex and Fox had no written contract. The arrangement with Fox was that Middlesex should buy from it at a fixed price and sell within a certain price range. Purchases by Middlesex from Fox were not delivered to Middlesex but were shipped directly to the latter's customers. Purchase orders would be received by Middlesex and accepted if Fox had supplies available, and shipping orders were immediately sent to Fox. Every purchase by Middlesex was immediately offset by a sale and no inventories were accumulated. No additional capital was required to be added to the original capital of $750. The business developed rapidly. Fairforest became the largest purchaser and ordered large quantities of the compound for treating cotton duck, which was used by the armed services for covers, tents, and similar purposes. Middlesex was able to sell all of the compound that it could purchase from Fox. The business became so large that Fox could not meet the demand and made arrangements *258 with the McKean Chemical Company to supply additional compound. By the middle of 1943 Middlesex was selling all the supplies which it could purchase. The income of the Middlesex Products Company resulted from petitioner's contact with Timmons and from petitioner's success in obtaining customers for the surplus of Fox Chemical Company. There was no business reason for making Arline a partner in the Middlesex Products Company. The partnership returns of Middlesex for the taxable years ended November 30, 1942, November 30, 1943, and November 30, 1944, show net income of $98,904.24, $105,640.83, and $124,098.70, respectively. These returns treated petitioner, Arline, and John as equal partners. In their individual income tax returns for 1943 and 1944, petitioner and Arline each reported one-third of the net income of the business for the fiscal years ending in 1943 and 1944. During the year 1942 petitioner, Arline, and John each withdrew a total of $18,500 from Middlesex; during the year 1943 each withdrew a total of $32,000; during the year 1944 petitioner withdrew a total of $26,500, while Arline and John each withdrew a total of $28,500. Arline deposited all her withdrawals from *259 the business in bank accounts in her name in the First National Bank of Mt. Vernon and the First National Bank in Greenwich, Connecticut. In 1943 Arline bought a house for $10,000 in Greenwich, Connecticut, which she furnished. Petitioner, Arline, and their children moved there from Mt. Vernon, New York. During the periods here involved petitioner did not take out additional insurance or increase his insurance. Arline took out and paid for insurance on petitioner's life in favor of herself and their children. Middlesex was dissolved on or about November 30, 1945. In a notice of deficiency mailed to petitioner on August 20, 1947, respondent determined deficiencies for 1943 and 1944 which resulted from attributing to petitioner that portion of the business income for the fiscal years 1942, 1943, and 1944 which had been credited to Arline. The parties did not, acting in good faith and with a business purpose, actually intend that petitioner's wife join together with petitioner and John F. Timmons as a partner in carrying on business. Opinion Petitioner claims his wife was a true partner as shown by several circumstances. It is stated that she furnished funds to open the office, *260 but the evidence shows that, whatever their source, the amount used was negligible and that capital was of no consequence whatever in the earning of the income, it being stipulated that expenses were nominal. It is stated that the wife performed services, and it was intended that she should take full charge of the office, but the record shows that only for a few days in the early period of the business did she spend any time there whatever. The services so rendered are not shown to have had any appreciable influence on the business earnings. It is stated that she, together with petitioner and his partner, was authorized to sign checks. But it appears that the girl in charge of the office, admittedly not a partner, was similarly authorized. It is stated that the wife received and had full control over her share of the profits, but as far as the record shows a large part, if not all, of these proceeds after taxes was used to pay for insurance on her husband's life and for the house in which they lived and its furnishings, which would normally be regarded as obligations of the husband and for which he paid prior to the commencement of the business. It is stated that in return petitioner *261 paid his wife rent asserted to be at the rate of $75 a month, but an examination of the wife's tax returns shows that no such item was reported by her at any time as her income. It is stated that this case differs from the usual situation because the wife was a partner from the beginning of the business. But we have found as a fact that all arrangements to organize the enterprise and to create the earnings of the business were made before any step was taken to include the wife as a participant. We find nothing in these, or any of the other factors held to be significant, , sufficient to discharge petitioner's burden of proof so as to warrant the requisite finding of actual intent to carry on business with the wife as a true partner. Decision will be entered for the respondent.